IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 14–cv–00134–PAB–KMT

SPRING CREEK EXPLORATION & PRODUCTION COMPANY, LLC,

      Plaintiff,

v.

HESS BAKKEN INVESTMENT II, LLC, F/K/A TRZ ENERGY LLC, and
STATOIL OIL & GAS, LP, F/K/A BRIGHAM OIL & GAS, LP,

      Defendants.

---

# ORDER

---

      This matter is before the court on Defendants' Hess Bakken Investment II, LLC ("Hess

Bakken") and Statoil Oil & Gas, L.P. ("Statoil") "Motion to Strike the "Rebuttal" Expert Report

of Rick Chamberlain and Adrian Reed" [Doc. No. 163] ("Mot") filed November 20, 2015.

Plaintiffs Spring Creek Exploration & Production Company, LLC ("Spring Creek") and Gold

Coast Energy LLC ("Gold Coast") filed 'Plaintiffs' Response in Opposition to Defendants'

Motion to Strike the "Rebuttal" Expert Report of Rick Chamberlain and Adrian Reed" [Doc. No.

181] on November 20, 2015 ("Resp.") and on December 7, 2015 "Defendants' Reply in Support

of Motion to Strike the "Rebuttal" Expert Report of Rick Chamberlain and Adrian Reed" [Doc.

No. 195] ("Reply") was filed.  The matter was set and re-set for hearing several times and was

eventually heard on February 19, 2016.  [Minutes, Doc. No. 257.]  Following the hearing, the

court took the matter under advisement and allowed counsel to submit supplemental briefing on

particularized issues raised at the hearing.  "Defendants' Supplemental Briefing in Support of Motion to Strike the "Rebuttal" Expert Report of Rick Chamberlain and Adrian Reed" [Doc. No. 252] and "Plaintiffs' Supplemental Response in Opposition to Defendants' Motion to Strike the "Rebuttal" Expert Report of Rick Chamberlain and Adrian Reed" [Doc. No. 251] were timely filed.

This case involves Plaintiffs' allegations that in October 2009, Spring Creek entered into a multi-part transaction and agreement with the predecessor of Defendant Hess Bakken Investment II, LLC ("Hess Bakken"), TRZ Energy ("Spring Creek/TRZ Agreement"), selling its interests in an area known as the Tomahawk Prospect.  As part of the Spring Creek/TRZ Agreement, Spring Creek assigned all of its existing mineral leasehold interests to TRZ, which eventually were received by Hess Bakken when it took over TRZ.  Through the Spring Creek/TRZ Agreement, Spring Creek retained an overriding royalty interest ("ORRI") on any mineral production on those existing leases.  The Spring Creek/TRZ Agreement also required TRZ, and later Hess Bakken, to assign Spring Creek an ORRI on all leases TRZ or Hess Bakken acquired in the Tomahawk Prospect during the three year term of the agreement.  Besides the transfer of interests and the ongoing and potential future ORRIs on well production, Plaintiffs contend that the Spring Creek/TRZ Agreement required TRZ, and then Hess Bakken, to continue pursuing new leases in the Tomahawk Prospect in exchange for Spring Creek's agreement not to compete with TRZ or Hess Bakken in acquiring new leases within the boundaries of the Tomahawk Prospect.  Hess Bakken denies that the Spring Creek/TRZ Agreement required either TRZ or Hess Bakken to acquire any new leases.

Subsequent to the Spring Creek/TRZ Agreement, Hess Bakken and Defendant Statoil Oil & Gas ("Statoil") entered into a confidential settlement and purchase agreement in which Hess Bakken sold and assigned all of its leases in the Tomahawk Prospect, including those acquired from Spring Creek pursuant to the Spring Creek/TRZ Agreement, to Statoil.  Further, as part of the settlement agreement with Statoil, Hess Bakken was required to cease pursuing and acquiring new leases in the Tomahawk Prospect.  Spring Creek contends that Hess Bakken and Statoil purposefully left Plaintiffs ignorant as to this agreement and that Spring Creek unknowingly continued to abide by its agreement not to compete in the Tomahawk Prospect to its detriment, expecting future ORRI payments according to the Spring Creek/TRZ Agreement.  Plaintiffs further contend that because of that, Statoil became subject to the obligation of Hess Bakken to both compete for leases in the Tomahawk Prospect and assign commensurate ORRIs to Spring Creek on new leases acquired in that area during the remaining term of the agreement since Spring Creek was unaware of the unilateral agreement between Statoil and Hess Bakken to deprive Spring Creek of the benefit of its bargain.  Statoil disputes that it is obligated under the Spring Creek/TRZ Agreement to anything except for payment of the ORRIs to Spring Creek on the existing leases Spring Creek transferred to TRZ and that Hess Bakken later transferred to Statoil in settlement of a different matter.  The parties do not dispute that Statoil has been paying ORRI on these existing leases to Spring Creek but disagree whether the amounts paid were accurate.

## PROCEDURAL BACKGROUND

On April 10, 2014, the Court entered a scheduling order [Doc. No. 40] which provided for a three-part expert disclosure schedule.  The first date was for Plaintiffs to disclose

affirmative experts, the second was for Defendants to disclose both its affirmative experts and also to disclose its rebuttal experts to Plaintiffs' previously disclosed affirmative experts. Finally, the third date was for Plaintiffs to disclose rebuttal experts to any affirmative experts disclosed by Defendants.

Plaintiffs timely disclosed their affirmative experts, including the report of Berkley Research Group ("BRG") prepared by experts Rick Chamberlain and Adrian Reed. [Doc. No. 181, Ex. E., (hereinafter "BRG Exp.Rpt.")]  Plaintiffs characterize that report as containing

> "essentially two main opinions: (1) the discounted present value of the overriding royalty interest on leases in the Area of Mutual Interest which results in a damage estimate between $24.2 million and $59.3 million; and (2) the discounted present value of potential working interests in the same area which results in a damage estimate of  $182 million to $403 million.

(Resp. at 7.)

On July 15, 2015, Defendants timely served their expert reports, including the reports of Bill Abington, Terry Payne, and Austin Mater, which Defendants jointly endorsed.  (Mot., Exs. 2–4).  Defendants assert that each of these reports were "intended solely to contradict or rebut evidence on the same subject matter identified by Plaintiffs in their initial expert disclosures." (Mot. at 2.)

Arguing against this characterization and asserting that Defendants' experts offered both affirmative and rebuttal opinions, on September 25, 2015, Plaintiffs served a "rebuttal" report authored by Rick Chamberlain and Adrian Reed of BRG.  (Mot., Ex. 1, hereinafter "BRG September 25th Report".)  It is this report that Defendants seek to strike, characterizing it as an improper sur-rebuttal opinion, maintaining that Defendants did not disclose any affirmative experts and therefore there is nothing for Plaintiffs' experts to rebut.

4

Plaintiffs insist that the BRG September 25th Report is not only proper rebuttal to Defendants' experts' affirmative opinions, which they claim were mixed with Defendants' rebuttal opinions, but also, alternatively, that portions of the report are also proper supplemental opinion pursuant to Fed. R. Civ. P. 26(a)(2)(E).

While this motion was under advisement, District Judge Philip A. Brimmer issued his Order [Doc. No. 286] ("Working Interest Order") holding that "at trial, plaintiffs . . . will not be permitted to present evidence of the value of any working interests that they may have acquired had they not entered into, or treated as rescinded, the contract at issue in this case."  This ruling greatly curtails this court's need to examine all the arguments submitted by counsel on this motion, including many of the issues argued at the hearing.

**LEGAL STANDARD**

Rule 26(a) requires a party to disclose the identity of any expert witness it may use at trial.  Fed. R. Civ. P. 26(a)(2)(A).  A party must make this disclosure "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).  As is the case here, the court most often sets forth the time and sequence for disclosing experts in a scheduling order with extensions of the dates occurring as modifications to the scheduling order.  Fed. R. Civ. P. 16(b)(1).

> **A.**     ***Affirmative Expert Opinion verses Expert Opinion Offered in Rebuttal***

> **1.**     ***Contradict or Rebut***

Fed. R. Civ. P. 26(a)(2)(C)(ii) permits the admission of rebuttal expert testimony that is "intended solely to <u>contradict or rebut</u> evidence on the same subject matter identified" by an initial expert witness.  *TC Sys. Inc., v. Town of Colonie, NY,* 213 F. Supp. 2d 171, 179 (N.D.N.Y.

2002); *Carroll v. Allstate Fire & Cas. Ins. Co.,* No. 12-CV-00007-WJM-KLM, 2013 WL
3810864, at *5 (D. Colo. July 22, 2013) (*citing Lindner v. Meadow Gold Dairies, Inc.*, 249
F.R.D. 625, 636 (D. Hawaii 2008) (individuals designated only as rebuttal experts could present
limited testimony, could not testify as part of a party's case-in-chief, and would not be allowed to
testify "unless and until" the experts they were designated to rebut testified at trial). *See also
Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 749, 759 (8th Cir. 2006) ("The function of rebuttal
testimony is to explain, repel, counteract or disprove evidence of the adverse party.")

In terms of rebuttal evidence, it is irrelevant through which expert witness the initial
affirmative evidence is elicited; that it actually be elicited in the course of the opposing party's
case-in-chief is the determining factor in the context of the admissibility analysis." *Carroll*, at
*5. Rebuttal expert reports "necessitate 'a showing of facts supporting the opposite conclusion'
of those at which the opposing party's experts arrived in their response reports." *Bone Care Int'l,
LLC v. Pentech Pharmaceuticals, Inc.,* 2010 WL 3894444, *15 (N.D. Ill. Sep. 30, 2010) (quoting
*ABB Air Preheater, Inc. v. Regenerative Environmental Equip., Inc.,* 167 F.R.D. 668, 669
(D.N.J. 1996).

By contrast, an affirmative expert serves to establish a party's case-in-chief. *See Lead
GHR Enters., Inc. v. American States Ins. Co.*, No. CIV. 12–5056–JLV, 2014 WL 1246499, at *3
(D.S.D. Mar. 25, 2014) (quoting *Marmo*, 457 F.3d at 759.)

Rebuttal expert reports are not the proper place for presenting new arguments. *1–800
Contacts, Inc. v. Lens. com, Inc.,* 755 F. Supp. 2d 1151, 1167 (D. Utah 2010)(*rev. in part on
other grounds*, 722 F.3d 1229 (10th Cir. 2013)); *LaFlamme, id.* "[R]ebuttal experts cannot put
forth their own theories; they must restrict their testimony to attacking the theories offered by the

adversary's experts." *International Bus. Machs. Corp. v. Fasco Indus., Inc*., No. C–93–20326 RPA, 1995 WL 115421, at *3 (N.D. Cal. Mar. 15, 1995); *Boles v. United States*, No. 1:13CV489, 2015 WL 1508857, at *2 (M.D.N.C. Apr. 1, 2015).

However, "[i]f the purpose of expert testimony is to 'contradict an expected and anticipated portion of the other party's case-in-chief, then the witness is not a rebuttal witness or anything analogous to one.'" *Amos v. Makita U.S.A.,* 2011 WL 43092 at *2 (D. Nev. Jan. 6, 2011) (quoting *In re Apex Oil Co.,* 958 F.2d 243, 245 (8th Cir. 1992) (emphasis added)); *Century Indem. Co. v. Marine Grp., LLC,* No. 3:08-CV-1375-AC, 2015 WL 5521986, at *2-3 (D. Or. Sept. 16, 2015); *LaFlamme v. Safeway, Inc.,* 2010 WL 3522378, *3 (D. Nev. Sep. 2, 2010).

### 2.   *Same Subject Matter*

In addition to requiring that rebuttal evidence contradict affirmative evidence, rebuttal evidence must also be directed to the same subject matter identified by the affirmative expert. *See* Fed. R. Civ. P. 26(a)(2)(C)(ii). Neither the Advisory Committee Notes to Rule 26, nor case law in the District of Colorado, as cited by the parties, explains precisely what is meant by "same subject matter." However, "expert reports that simply address the same general subject matter as a previously-submitted report, but do not directly contradict or rebut the actual contents of that prior report, do not qualify as proper rebuttal or reply reports." *Boles, id*. (*citing Withrow v. Spears*, 967 F. Supp. 2d 982, 1002 (D. Del. 2013).

In *Armstrong v. I-Behavior Inc.*, No. 11-CV-03340-WJM-BNB, 2013 WL 2419794, at *3 (D. Colo. June 3, 2013), District Judge William B. Martínez ruled that courts should not place an overly restrictive interpretation on this operative phrase, rejecting the plaintiff's argument that the phrase should be construed narrowly. *Id.* (relying on *TC Sys. Inc.,* 213 F. Supp. 2d at 180).

In *TC Sys. Inc*., the plaintiff's expert addressed damages caused by a public right-of-way from an accounting perspective but the defendant's rebuttal expert addressed the damages from the same public right-of-way from an accounting perspective. *Id.* at 180. The plaintiff claimed that the defendant's rebuttal expert was improperly designated as rebuttal testimony because the expert sought to introduce new arguments. The court stated that were it to confine the phrase "same subject matter" in an overly restrictive fashion, it would effectively preclude many methodologies from being introduced through rebuttal evidence. Despite the different methodologies applied by the experts, the court found each party addressed the same subject matter—*i.e.*, damages associated with the public right-of-way. *Id. Armstrong* itself involved two experts opining on the plaintiff's economic loss as a result of her constructive discharge from employment. The plaintiff's expert addressed damages from a quantitative perspective, examining loss of earnings, loss of employee benefits, and non-compensation for overtime pay. *Id*. at 1. The defendant's expert approached the plaintiff's damages from a qualitative and a quantitative perspective as seen through the lens of a vocational expert addressing the plaintiff's ability to find comparable employment after leaving the defendant, including the plaintiff's efforts to find comparable positions and the reasonable duration of time required to find comparable employment. Judge Martínez rejected a narrow reading of "same subject matter," finding that such a construction would impose an additional "restriction" on parties that is not included in the Federal Rules of Civil Procedure and held that the differing methodologies used by the experts did not constitute new affirmative opinions. *Id*. at 4. *See also Equal Employment Opportunity Commc'n v. JBS USA, LLC,* No. 10-CV-02103-PAB-KLM, 2014 WL 2922625, at \*9 (D. Colo. June 27, 2014) (approving application of *TC Sys., at* 180.)

The Central District of California, however, took the opposite tack in *Vu v. McNeil-PPC, Inc.*, No. CV091656ODWRZX, 2010 WL 2179882, at *2 (C.D. Cal. May 7, 2010).  In *Vu*, the plaintiff's expert opined that the cause of death of the plaintiff's decedent was the use of a specific medication.  The plaintiff moved to strike the defendant's rebuttal expert who offered alternate theories of the possible causes death.  The defendant argued that this opinion was properly asserted in rebuttal because it was "related" to the same subject matter as the opinion offered by the plaintiff's expert.  The *Vu* court adopted a narrow reading of the Rule, holding that if the phrase 'same subject matter' is read broadly to encompass any possible topic that relates to the subject matter at issue, it will blur the distinction between 'affirmative expert' and 'rebuttal expert.'  *Id.* at *7-8.  The court held that such broad reading of Rule 26(a)(2)(C)(ii) would render the scope of the "same subject matter" limitless and lead to unjust results.  *Id.*

Likewise in *Century Indem. Co. v. Marine Grp., LLC*, 2015 WL 5521986, at *5, in response to the plaintiff's affirmative expert's report analyzing an insurance policy's coverage, the defendant's rebuttal expert repeatedly criticized the plaintiff's expert's conclusions by pointing out the effects of policy exclusions on the coverage analysis.  The original affirmative opinions by Plaintiff's expert did not consider or address any policy exclusions at all.  The court found that the Defendant's expert's opinion containing coverage analysis in light of the policy exclusions was a new theory and not encompassed in "the same subject matter" for purposes of characterizing the defense expert as a rebuttal witness.  (*Id.*)

### B.    *Applicability of Fed. R. Civ. P. 37 Sanctions*

Fed. R. Civ. P. 37(c)(1) provides that failure to comply with Rule 26(a) precludes the use of the expert information at issue "to supply evidence on a motion, at a hearing, or at a trial,

unless the failure was substantially justified or is harmless." *Id.  See also Summers v. Mo. Pac. R.R. Sys.*, 132 F.3d 599, 604 (10th Cir. 1997); *cf. Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 952 (10th Cir. 2002) ("Rule 37(c) permits a district court to refuse to strike expert reports and allow expert testimony even when the expert report violates Rule 26(a) if the violation is justified or harmless."); *Carroll,* at *3.  "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir.1999) (quoting *Mid–Am. Tablewares, Inc. v. Moqi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996)).

The Tenth Circuit has enumerated four factors the court should use to guide its discretion in determining whether a Fed. R. Civ. P. 26(a) violation is substantially justified or harmless: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Id.* (citations omitted). The non-moving party has the burden of showing that it was substantially justified in failing to comply with Fed. R. Civ. P. 26(a) and that such failure was harmless. *See Sender v. Mann*, 225 F.R.D. 645, 655 (D. Colo. 2004) (citation omitted).  Therefore, even if Plaintiffs' expert opinions in the BRG September 25th Report violate Rule 26(a), the court may nonetheless decline to strike one or more of the opinions contained therein if the violations were substantially justified or harmless.  In analyzing these factors, the court notes that the Tenth Circuit has stated that "[t]he decision to exclude evidence is a drastic sanction." *Summers*, 132 F.3d at 604; *Carroll*, at *3.

*ANALYSIS*

**A.    *Excluding Evidence of Working Interest Damages, Issues Remaining Viable in the First Two Rounds of Expert Disclosures.***

     **1.    *BRG Expert Report dated December 15, 2014.***

Examining the initial BRG Expert Report, this court has determined that all calculations, methodology or other expert opinion testimony having to do with Summary Opinion #2[1] is now excluded pursuant to District Judge Brimmer's March 24, 2016 Order. *Id*. at 3. This would include the valuations set forth on page 10 of the BRG Expert Report with respect to calculation of working interests, as well as the entire section entitled "Value of Zavanna working interest" (*Id*. at 36-40), as well as well construction costs (*id*. at 41) and operating expenses (*id*. at 43) to the extent the last two are applicable to a working interest damage model, although this information might be relevant to the value of ORRI from new wells on disputed leases.[2]

Therefore, the primary thrust of the BRG Expert Report as the case is now postured concerns the valuation of the ORRIs owed to Plaintiffs on existing and/or disputed leases.

     **2.    *Defendants' Expert Disclosures, July 15, 2015***

          **a.    *Abington Report***

The summary of opinions in William B. Abington's July 15, 2015 report [Doc. No. 160-2] ("Abington Report") pertaining to ORRI damages are as follows:

Overriding Royalty Interests

---

[1] *See* Resp. at 7; *infra* at 4.

[2] Obviously a contested issue in the case is whether Statoil owes Plaintiffs any ORRIs on leases acquired by Statoil subsequent to Statoil's settlement agreement with Hess Bakken. These leases are frequently referred to as the "disputed leases" or "new leases."

1. The calculations for ORRI payments for historical production from disputed leases of $1.85 million are not BRG's calculations.[3] Further, the calculations are overstated and do not agree with the terms of the contracts that originally created the ORRI. If it is determined that ORRI payments for historical production on disputed leases are due, the correct amount is approximately $0.8 million.

2. BRG's calculations related to future production from existing wells on undisputed leases do not represent financial damages that the Plaintiffs have experienced. We have seen no evidence to suggest that Statoil will cease making ORRI payments in the ordinary course of business for production from undisputed leases. Also, the amount of ORRI that BRG estimated to be due in the future from existing wells on disputed leases of $1.43 million includes several calculation errors. Correcting only for the errors in calculating the ORRI percentage for disputed leases, the future ORRI amount for future production from existing wells on disputed leases would be approximately $0.6 million.

3. BRG's calculations related to future production from undrilled wells, whether on disputed or undisputed leases, are highly speculative and fail to account for conditions as they existed as of the date of the alleged breach.

*Id*. at 8.

### b.       *Payne Report*

The expert opinions of Terry D. Payne are contained in his July 15, 2015 report [Doc. No. 160-3] ("Payne Report").  In summary, Payne opines that BRG has made determinations of expected value for Plaintiffs' claimed overriding royalty interests in the Tomahawk Prospect based on a discounted cash flow model.  *Id*. at 11.  Payne states that BRG arrived at this calculation by incorrectly using assumed projections of oil and gas production, product prices, drilling schedules, well development density, well capital costs, well operating costs, taxes, discount rate and improvements in future well performance among various other assumptions. *Id.*  Payne criticizes this approach and instead created production type curves based on the actual

---

[3] Abington asserts that BRG was provided this calculation by Zavanna (a former affiliate of Plaintiffs into which Spring Creek has now merged) and that BRG did not do any independent analysis of the calculations.  (Abington Report at 40.)

performance of existing wells producing from the Bakken and Three Forks formations as of early 2010. *Id*. at 12. Payne opined that "BRG's calculation of well performance in their damage models did not take into account any reserve classification or reserve risk assessment. It is Payne's opinion that risk assessment and risk adjustments are necessary when placing value on oil and gas reserves or forecasts of oil and gas production." *Id*. at 15-16. Also, Payne used the 2009 SPEE Survey [Doc. No. 160-3 at 191] to show reserve adjustment factors for various classifications of reserves. *Id*. at 16. Ultimately, Payne came to the following conclusions:

> BRG's mid-case expected values are significantly overstated, in part, due to the following:
>
> 1. The well development density used by BRG would not be supportable using existing well development data as of early 2010 nor would it be supportable based on information operators were submitting to the NDIC regarding appropriate well development densities in the area;
>
> 2. The projected oil and gas volumes used by BRG are inconsistent with, and substantially overstate, the actual produced volumes of wells completed in and producing from the Bakken and Three Forks formations in and around the Tomahawk AMI as of early 2010; and
>
> 3. BRG failed to account for the reserve risk and uncertainty associated with oil and gas production from the Bakken and Three Forks formations in the Tomahawk AMI as of early 2010.

*Id*. at 16-17.

These opinions all could be relevant to the alleged loss of ORRI income connected to disputed leases.

### c.    *Mater Report.*

Austin Mater introduced his expert report by noting

> I have been retained by Hess Bakken Investments II, LLC ("Hess Bakken") and Statoil Oil & Gas LP ("Stat") to provide and submit expert opinion testimony in the above referenced case regarding the "Expert Opinion – Spring Creek

> Tomahawk Prospect" completed by Tod G. Maleckar and that portion of the BRG
> Valuation Report related to the acquisition of leases and working interest claims
> on behalf of Plaintiffs.

Report of Austin Mater dated July 15, 2015 [Doc. No. 160-4] ("Mater Report") at 1.  Mr.

Mater's opinions largely deal with the financial capability of Plaintiffs to acquire leases and

develop wells in the Tomahawk Prospect.  Mr. Mater's calculations are relevant only to a

working interest damages model based upon setting aside the Spring Creek/TRZ Agreement and

calculating damages as though Plaintiffs would have proceeded to compete with TRZ, Hess

Bakken and Statoil for lease acquisition and mineral production in the Tomahawk Prospect, as

opposed to a damages model based on Statoil's alleged obligation to pay Plaintiff ORRI interest

on new wells developed on Statoil leases obtained subsequent to Statoil's settlement agreement

with Hess Bakken.  Therefore, the Working Interest Order eliminates the relevance of Mr.

Mater's expert opinions to any part of the BRG September 25th Report.

### B.       Whether Defendants' Expert Disclosures were Rebuttal or Affirmative

#### 1.       Whether a Defendant May Present Affirmative Expert Opinion on a Plaintiff's Damages

While it is the BRG September 25th Report which is the object of the Motion to Strike

herein, the first analysis must be directed at the expert reports filed by Defendants on July 15,

2015.  Whether those reports were solely in rebuttal to BRG's initial affirmative report or are, as

Plaintiffs claim, reports containing both classic rebuttal opinion as well as new, affirmative

opinions will govern the outcome, in part, of the admissibility of opinions in the BRG September

25th Report.

Preliminarily, Defendants argue that since Plaintiffs have the burden of proof on

damages, any opinions from defense expert witnesses on damages necessarily must be in rebuttal

in a case not involving counterclaims.  While this argument carries some appeal at first glance, the court finds it overly broad in light of the clear case law to the contrary.  While it is true that the burden is upon Plaintiff to prove its damages in any civil proceeding, *Micale v. Bank One N.A. (Chicago)*, 382 F. Supp. 2d 1207, 1224 (D. Colo. 2005) (the plaintiff has the burden of proof to demonstrate damages and must establish by a preponderance of the evidence that he has in fact suffered damage), if the Plaintiff has no damages, he likewise has no case.[4]  Therefore, some proof of damage to a plaintiff from the alleged behavior of the opposing party is certainly *an expected and anticipated portion* of any Plaintiff's case-in-chief.  That evidence, while often presented at least in part by an expert, can and is presented in any number of other ways as well, including testimony and party or third-party documents such as tax returns, bank account statements, or profit and loss statements, just to name a few.  Therefore, the fact that the Defendants' experts, Abington and Payne, offered expert opinions about Plaintiffs' damages does not unequivocally mean that the opinions are necessarily in rebuttal.  Instead, the relevant inquiry is whether a responding expert witness limits himself to "poking holes" in the Plaintiffs' expert report, or whether the Defendants' experts are, perhaps in addition to "poking holes," offering new theories or addressing topics not directly presented in Plaintiffs' original experts' opinions.  *Van Maanen v. Youth With a Mission-Bishop*, No. 1:10-CV-00493 AWI, 2011 WL 5838185, at *3 (E.D. Cal. Nov. 21, 2011).

Defendants' experts are entitled to present their own new theories concerning Plaintiffs' alleged damage calculations.  However, if they decide to do so, those opinions may be considered affirmative in nature.

---

[4] Excluding specialty cases such as those for declaratory judgment, of course.

**2.    Whether Defendants' Expert Opinions Were Rendered on the "Same Subject Matter."**

This court finds that both in *Vu* and in *Century Indemnity*, the courts applied an unreasonably constrained interpretation of "same subject matter" which led to questionable results. For instance, it is beyond cavil that insurance policies -- contracts to insure -- almost always contain policy exclusions that can greatly influence coverage analysis. In *Century Indemnity,* the defendant's expert pointed out the failure of a claimant's expert to even address known exclusions in the contract and then provided a correction which considered the exclusions admittedly part and parcel of the policy contract. That the court found this expert's opinion to be a new, affirmative opinion is, in this court's view, incongruous and similar application could lead to unreasonable positions with respect to disclosure timeliness. However, to stick with a blanket rule that any new methodology utilized by a rebuttal damages witness, no matter how divergent from the original affirmative expert opinion, will always be simple rebuttal renders superfluous the term "same subject matter" and could lead to otherwise affirmative disclosures being rendered impervious to collateral attack.

As the court noted in *Bowman v. Int'l Bus. Mach. Corp.,* No. 1:11-CV-0593-RLY-TAB, 2013 WL 1857192, at *7 (S.D. Ind. May 2, 2013)

> [Defendants] do not have free reign to produce a rebuttal report containing additional analyses on the basis that this is the same subject matter of the initial reports. A rebuttal report is not the time to change methodologies to account for noted deficiencies; instead, it is to respond to criticisms of such methodologies.

*Id*. Therefore, this court adopts a case specific view that requires the court to examine each opinion to evaluate whether it can fairly be characterized as a corrective opinion directed generally at debunking the original expert's method or a truly different model all together,

bearing little or no resemblance to the first expert's professed methodology.  The former is fairly characterized as rebuttal; however, the latter is affirmative and fairness dictates that the opposing side have a chance to present rebuttal.

### a.    Abington Opinion 1.

First, Abington takes issue with which leases were included in the damages calculation, stating that only "disputed" leases should be included.  Abington also disputes BRG's inclusion of all leases acquired by Statoil after April 12, 2010, claiming that since Statoil was actively acquiring leaseholds in the AMI long before its agreement with Hess Bakken, "it is reasonable to expect that Statoil would have acquired some of the disputed leases regardless of the alleged breach by Hess Bakken."  Abington also utilized the contract documents to include what he believes would be the appropriate share of actual costs and then offers revised calculations for the wells he claims should be part of the Plaintiffs' damages.

The court finds all of this information to be in rebuttal to the first BRG Expert Report.

### b.    Abington Opinion 2.

Abington takes issue with inclusion of damages based on future production for non-payment of ORRI on undisputed leases because Statoil has been and is continuing to make ORRI payments on undisputed leases.  Abington then again criticizes BRG for including undisputed leases characterized as disputed in the calculations and recalculated the base alleged losses without those leases.  Again, the court finds that Abington's opinions concerning this issue to be solely in rebuttal.

### c.      *Abington Opinion 3.*

Again, Abington criticizes BRG's inclusion of certain undisputed leases as disputed and opines that there is no basis to conclude that Statoil will not make normal ORRI payments if and when new wells come on line in undisputed lease territory.

As to the future production of undrilled wells, Abington says BRG's future ORRI opinions are highly speculative.  Again, both of these opinions are clearly rebuttal.

Abington then offers opinions to contradict BRG's opinion as to the value of ORRI from future undrilled wells, offering a different approach based on the field rules in effect in early 2010 as discussed in the Payne Expert Report.  (Abington Report at 42-43.)  Abington states, on future ORRI damages, that the BRG Report suffers from some of the same flaws he had noted in the working interest calculations, namely unreasonable lease and operating price assumptions and inappropriate discount rate.  Abington sets forth his own methodology concerning the appropriate discount rate on pages 29-31 and his own methodology to determine pricing on pages 32-35.  These opinions, while starting out as criticism of the BRG Report, also include Defendants' own affirmative theories of damage calculation.  These opinions are more than a mere different methodology to calculate ORRI; they involve completely different hypotheses for projected well development.  Therefore, even under a liberal reading of the phrase "same subject matter," the court finds that the opinions of Abington concerning future production from undrilled wells are affirmative in nature and therefore, subject to rebuttal by Plaintiffs' experts, consistent with this order and the Working Interest Order.

### d.      Payne Opinion

Again, the phrasing of the opinion testimony in the Payne Report summary sounds like rebuttal in that it criticizes the BRG initial report.  However, as to each of the three opinions, Payne does not stop at his critique of BRG's methodologies, but instead goes forward and presents what Payne asserts are the correct methodologies, utilizing his production type curves and reliance on actual performance of existing wells to extrapolate to undrilled wells.

Therefore, Payne's report is largely an affirmative position to which rebuttal expert opinion may be allowed.

### C.      Plaintiffs' BRG September 25, 2015 Expert Report

The vast majority of BRG's September 25th Report is devoted to opinions concerning the working interest damages model that has now been excluded by the Working Interest Order. Within its "Opinions related to Working Interest" section (p. 3-26), however, BRG does address the new theories addressed by Abington Opinion 3, *infra*, which may be relevant to the calculation of future-owed ORRI, including historical transaction values (*id*. at 7) and whether a theory of production weighted average must be used in calculating the net override rather than a straight arithmetic average.  (*Id*. at 30.)  These are rebuttal opinions to Defendants' affirmative expert disclosures and were therefore properly disclosed.

Beginning on page 27 of the BRG September 25th Report, the experts proffer what they deem to be rebuttal to Abington ORRI Opinion 1 conceding certain errors in calculation of ORRI in Abington's Opinion 1, but blaming early incorrect and incomplete Statoil production numbers. BRG agrees to supplement to correct its calculations once the correct documents are produced and the Statoil title opinions digested.  (*Id*. at 7-8.)  The BRG September 25th Report now has a

number of opinions regarding the validity of Zavanna's ORRI calculations, including the documents these numbers may have been based on, the leases included in these calculations, the relevant leasing dates, and the general appropriateness of the calculations.

The court finds that this information is not properly produced as rebuttal expert opinion, however, it is nevertheless allowable as supplemental expert opinion pursuant to Fed. R. Civ. P. 26(a)(2)(E).[5] *See, e.g., Cook v. Rockwell Int'l Corp.,* 580 F.Supp.2d 1071, 1169 (D. Colo. 2006) (permissible supplementation of an expert's disclosures "means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure") (quoting *Anderson v. Seven Falls Co.*, No. 12-CV-01490-RM-CBS, 2013 WL 3771300, at *2 (D. Colo. July 18, 2013).)  Therefore, inclusion of this opinion in the BRG September 25th Report is harmless because the same information would have been disclosed as a supplemental report in any event.

Further, BRG argues that Statoil leases taken or acquired after February 1, 2010 are the appropriate leases to consider for disputation, (*id*. at 29), which simply bolsters their original opinion that was the subject matter of Abington's rebuttal opinions noted *infra*.  Similarly, BRG argues in favor of its discounted cash flow method of calculating future production from undrilled wells, rather than Abington's approach of using conditions as they existed in February, 2010, again merely bolstering BRG's approach after Abington's rebuttal opinions..

---

[5] "Material affecting damages is obviously relevant pursuant to Fed. R. Civ. P. 26, and parties have a duty to supplement not only documentary discovery responses, but also testimonial evidence such as that given by a Rule 30(b)(6) witness on Defendants' financials." *Gen. Steel Domestic Sales, LLC v. Chumley*, No. 13-CV-00769-MSK-KMT, 2015 WL 3498780, at *1 (D. Colo. June 2, 2015)

The court finds that these last two opinions in the September 25th BRG Opinion are improper sur-rebuttal.  However, considering the factors this court is charged to consider in connection with application of Fed. R. Civ. P. 37, including the prejudice or surprise to the party against whom the testimony is offered, the ability of the party to cure the prejudice, the extent to which introducing such testimony would disrupt the trial, and the moving party's bad faith or willfulness, the court finds that striking either of the opinions that could have been properly brought as supplemental disclosures or the two bolstering opinions is not appropriate.  The court finds no bad faith or willfulness on the part of Plaintiffs.  As a practical reality, the issues presented in the BRG September 25th Report became much less important to the case subsequent to the Working Interest Order.  The two improper areas of sur-rebuttal opinion are merely consistent with BRG's initial report and therefore introduction of the opinions is harmless and non-prejudicial to the Defendants in this case where there is no trial date set.  Plaintiffs' experts will be subject to cross-examination and the designation has eliminated any surprise to Defendants.  Finally, this court would look favorably on a request by Defendants for an additional 1 hour deposition of the BRG experts should Defendants find it necessary based only on the improper opinions rendered in the BRG September 25th Report.  Costs would be born, however, by both sides in the traditional manner.

It is therefore **ORDERED**

Hess Bakken Investment II, LLC ("Hess Bakken") and Statoil Oil & Gas, L.P. ("Statoil") "Motion to Strike the "Rebuttal" Expert Report of Rick Chamberlain and Adrian Reed" [Doc. No. 163] is **DENIED**.

Dated April 21, 2016.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge